ARGYLE et al. v. JOHNSON, County Treasurer.

No. 2244.   Decided September 26, 1911 (118 Pac. 487).

1. DRAINS—PURPOSES—PUBLIC HEALTH. Promotion of the public health need not be involved to make valid a law for reclamation of swamp or overflowed lands, by organization of a drainage district and taxation of the lands therein for the improvement. (Page 505.)

2. CONSTITUTIONAL LAW—DRAINS—DUE PROCESS—HEARING BEFORE COMPETENT TRIBUNAL. The drainage act (Comp. Laws 1907, secs. 760-779) is unconstitutional, as permitting private property to be taken without due process; owners of land included in a drainage district not being given a right to a hearing, before some competent tribunal, prior to the time the tax lien is irrevocably established, or the lands can be sold for delinquent assessments, on the question whether their lands are benefited by the drainage district, and, if so, whether the assessments are just and equitable, when compared with the assessments of other lands in the district.   (Page 507.)

APPEAL from District Court, Fourth District; *Hon. J. E. Booth,* Judge.

Action by Benjamin Argyle and others against Mont Johnson, County Treasurer.

Judgment for plaintiffs. Defendant appeals.

AFFIRMED.

*Jacob Evans* and *Elias Hanson* for appellant.

*A. B. Morgan* for respondents.

FRICK, C. J.

This is an appeal from a final judgment perpetually enjoining the collection of a certain drainage tax.

It is not clear upon what ground the district judge based his decision. From what is disclosed by the record, however, it seems that the injunction was granted upon the ground that the law under which the tax was imposed is void, because it authorizes the taking of property without due process of law.

The judgment was granted upon the pleadings, and it is contended here that the judgment must be sustained, because the answer of appellant presented no defense. This contention is untenable, since both the denials, as well as the affirmative averments, contained in the answer presented issues of fact which could not have been determined on a motion for judgment on the pleadings; and if the law under which the tax was imposed is valid the judgment cannot stand. We shall therefore treat the motion for judgment as a demurrer to the answer, and by that method determine the validity of the law which is assailed.

The law in its present form was adopted in 1907, and constitutes sections 760 to 779, inclusive, of the Compiled Laws of Utah 1907. The text of the act in question, so far as material here, is as follows:

"Sec. 760. Whenever any number of persons constituting a majority, of the holders of title, and who hold title to a major part of the land to be included in the proposed district susceptible of one mode of drainage from a common source and by the same system of works, desire to provide for the drainage of the same, they may propose the organization of a drainage district under the provisions of this act, provided the provisions of this act shall not apply to the drainage of mines.

"Sec. 761. A petition shall first be presented to the board of county commissioners of the county in which the lands, or the greater portion thereof, are situated, signed by the required number of holders of title, or of evidence of title, and shall set forth and particularly describe the boundaries of the proposed district, and shall pray that the same may be organized under the provisions. of this title. The petition shall be presented at a regular meeting of the board. of county commissioners and, for at least two weeks before the time at which the same is to be presented, shall be posted in three or more public places in the district or published in some newspaper published or having a general circulation in the county, together with a notice stating the time at which the same will be presented. If any portion of the proposed district shall lie within another county or counties, then the petition and notices shall, as above provided, be posted or published in a newspaper, published or having a general circulation in each of such counties.

"Sec. 762. When the petition is presented, the board of county commissioners shall hear it, and may adjourn the hearing from time to time, not exceeding four weeks in all. On the final hearing any person whose lands are susceptible of drainage by the proposed system, and who expresses in writing a desire to be included within the system, may upon application to the board and in its discretion, have his lands included in the district. On the final hearing the board shall by resolution establish and define the boundaries of the district as proposed in the petition or as amended as hereinbefore provided, fix the number of trustees, which shall not be less than three nor more than five and who shall be residents of the district, and provide for the election of such trustees and the organization of said district as hereinafter provided.

"Sec. 763. The board shall then give notice of an election, for the purpose of determining whether or not the proposed district shall be organized. The notice shall describe the boundaries established, and shall designate a name for the district. It shall be posted or published, as prescribed in the case of a petition, and shall state the time and place of the election and that ballots shall be cast containing the words 'Drainage District——yes,' or 'Drainage District——no,' and the names of persons to be voted for as trustees. No person shall be entitled to vote at any election held under the provisions of this act, unless he shall be a qualified elector in the district. The board of county commissioners shall appoint the judges for the first election."

Section 764 in substance provides that the county commissioners shall canvass the votes cast at the election provided for in the preceding section, and if two-thirds of all the votes cast thereat shall be in favor of organizing a drainage district then the commissioners shall enter an order on their minutes declaring the district organized, and shall also declare the persons receiving the highest number of votes elected as trustees of such district; and the section further provides that "no action shall be commenced nor maintained, nor defense made, affecting the validity of the organization, unless commenced or made within one year after the entering of" the order declaring the district organized.

Section 265 provides that subsequent elections shall be held biennially; and section 266 is to the effect that the trustees shall hold office for two years, and also provides for their qualification by taking an oath and by giving official bonds.

Section 767 is as follows:

"Sec. 767. Within thirty days after their election and qualification, the trustees shall meet and organize as a board, and shall elect a president, a secretary, and a treasurer, from among their own number. Each of such officers shall hold office during the pleasure of the board. The board of trustees shall have power to adopt a code of by-laws governing the conduct of the business and affairs of the district as a corporation in connection with its association with individuals in and outside of the district and regulating the use of its drainage system by outsiders. It shall also have power to make and execute all necessary contracts, to employ and appoint such agents, officers and employees as may be required, prescribe their duties and generally to perform all such acts as shall be necessary to fully carry out the purposes of this title. The board and its agents and employees shall likewise have the right to enter upon any lands to make surveys and may locate the necessary drainage works and the line for any drainage canal or canals, and the necessary branches for the same on any lands which may be deemed best for such location. It shall have the right also to acquire on behalf of said district by purchase or condemnation or other legal means, all lands and other property necessary for the construction, use, maintenance, repair, and improving of said canal or canals, drains, and works constructed (including canals, drains, or drain ditches being constructed by private owners), and all necessary appurtenances. In case of necessity for condemnation proceedings the board shall proceed in the corporate name of the district, under the provisions of the laws relating to eminent domain."

Sections 768 to 771 prescribe the duties of the officers, and provide for meetings of the board of trustees and the records to be kept by them.

"Sec. 772. Whenever the board of trustees deems it expedient it shall have power for the purpose of constructing drains, drainage canals and other required improvements, to issue bonds of the district to run not more than twenty years and to bear interest, pay semiannually at a rate not exceeding six per cent. per annum, to be called 'Drainage District Bonds,' and which bonds shall not be sold for less than their par value, and the proceeds of which shall be used for no other purpose than paying the cost of construction of such drain, drainage canal or other like work: Provided, that the aggregate amount of such bonds issued and outstanding may equal but never exceed in amount four per cent. of the value of the taxable property of any such district. The said board of trustees shall by resolution provide for the issuance and disposal of such bonds and for the payment of interest thereon the creation of a sinking fund for the ultimate redemption thereof and for the date and manner of the redemption of said bonds.

Sec. 773. Whenever any such drainage district bonds shall be issued in accordance with the provisions of this chapter, such bonds shall constitute a lien upon all of the lands and improvements thereon within the boundaries of the district, and the board of trustees of said district shall from time to time as hereinafter provided levy a sufficient tax to pay the annual interest charge on such bonds, and in addition thereto such an amount as a sinking fund, which shall, in the course of events and ultimately, amount to a sufficient sum to redeem said bonds.

Sec. 774. The board of trustees shall on or before the first day of February of each year prepare a statement and estimate of the amount of money to be raised by taxation within said district for the purpose of constructing canals, drains, drain ditches and other works, and maintain the same; pay the interest upon the bonded indebtedness of the district; creating a sinking fund for redeeming such bonds; and for the purpose of maintaining and repairing drainage canals, flumes, conduits, bridges, culverts and other works within said district; and for the management and control of such drainage system; and shall assess the entire amount needed in each year against all of the land within said district in proportion to the benefits resulting to each tract of land by the construction and maintenance of such drainage system; the said trustees shall view each tract of land within the district and shall carefully consider all of the benefits that each particular tract of land will receive from the construction and maintenance of such drainage system and assess each tract of land in accordance with the benefits received by it. After such assessment is made up the

secretary of the district shall notify, by mail each landowner of the amount of the tax assessed upon the land owned by him within the district; and stating therein the time and place when the board of trustees will meet as a board of equalization to hear and determine complaints made against such assessment. The board of trustees shall meet during the month of March of each year at a time and place to be designated by it to hear all complaints made against assessments made by it, at which meeting the board shall hear all complaints made, and after a full consideration thereof, shall equalize and finally determine the assessments to be made and levied upon each tract of land within the district, and shall thereupon certify the same to the county auditor of the county within which such district is located; the county auditor shall enter the same in the tax rolls of the county; and it shall be the duty of the county treasurer to collect such taxes at the time and in the same manner that the said county taxes are collected.

Sec. 775. All drainage taxes levied and assessed under the provisions of this title shall attach to and become a lien on the real property assessed from and after the thirty-first day of August. Drainage taxes shall become due and delinquent at the same time and shall be collected by the same officers in the same manner as state and county taxes.

Sec. 776. At the time of computing the tax, the county auditor shall place upon the assessment roll the district drainage taxes of the several districts in the county in which drainage taxes have been levied, as certified by the board of trustees."

Section 777 relates to the compensation to be paid to the trustees, and sections 778 and 779, the two last sections of the act, are not material here.

We have set forth the principal provisions of the act in full, so that the reader may understand its purpose, and may also see just what may be done under it. In this court the constitutionality of the act is also challenged, upon the ground that it authorizes the drainage of lands for private gain, rather than for the public good, such as the promotion of the public health, and some authorities are cited which hold that under certain conditions it is necessary that the public health be subserved by a proposed system of drainage, in order to authorize the imposition of a tax to pay for the construction and maintenance thereof. We remark, however, that the act in question is not based upon the theory that any drainage authorized by it shall promote the public health. The theory upon which

drainage laws like the one under consideration are based is well stated by Mr. Justice Gray, in *Head v. Amoskeag Mfg. Co.*, 113 U. S. at page 22, 5 Sup. Ct. at page 446, 28 L. Ed. 889, where, in speaking of such statutes he says:

"The statutes which have long existed in many states, authorizing the majority of the owners in severalty of adjacent meadow or swamp lands to have commissioners appointed to drain and improve the whole tract, by cutting ditches or otherwise, and to assess and levy the amount of the expense upon all the proprietors in proportion to the benefits received, have been often upheld, independently of any effect upon the public health, as reasonable regulations for the general advantage of those who are treated for this purpose as owners of a common property."

In 10 A. & E. Ency. L. (2d Ed.), 226, in discussing the principles upon which drainage statutes are upheld by the courts, it is said:

"And statutes, such as have been enacted in several states, authorizing a designated proportion or number of the owners of adjacent swamp or overflowed land to institute proceedings whereby the whole tract may be drained and the expense thereof assessed upon all the proprietors in proportion to the benefits received, have been upheld, independently of any effect upon the public health, as reasonable regulations for the general advantage of persons having a common interest in the proposed improvement."

The doctrine is further discussed and applied in *Wurtz v. Hoagland,* 114 U. S. 612, 5 Sup. Ct. 1086, 29 L. Ed. 229, and also by *Mr. Justice Peckham,* in *Fallbrook, etc, Dist. v. Bradley,* 164 U. S. 163, 17 Sup. Ct. 56, 41 L. Ed. 369. In the case of *Tidewater Co. v. Coster,* 18 N. J. Eq. 531, 90 Am. Dec. 634, Mr. Chief Justice Beasley, in closing the opinion, clearly and tersely states the distinction between laws wherein the state is made the prime mover in the drainage of lands to promote the public health, and laws through which the state, by virtue of its police power, authorizes the owners of swamp or overflowed lands to improve, by a system of drainage, the cost of which is met by levying assessments upon the lands benefited in proportion to the benefits. The constitutionality of laws of the latter class is also discussed and upheld in the case of *State v. Blake,* 35 N. J. Law, 208, and under the same title in 36 N. J. Law, 442.

The weight of authority is clearly to the effect that laws like those in question are not vulnerable upon the sole ground that the proposed drainage may not be conducive to the public health. That there is an element of public use or benefit under such laws sufficient to authorize the principle of eminent domain to be invoked in making them effective, the authorities already referred to leave no room for doubt. The objection last referred to must therefore be overruled.

The only other objection, which is the serious one in the case, is the one that the act in question permits private property to be taken without due process of law. This contention rests upon the fact that in forming drainage districts the law provides for no means by which a landowner may have a hearing and determination of the questions of whether his lands are subject to improvement, or can or will be improved by the system of drainage which is proposed by those who present the petition to the county commissioners. By an inspection of section 761, it will be seen that the petitioners themselves determine and define the boundaries of the proposed drainage district; and by the section following the board of county commissioners is required to establish the boundaries of the drainage district as the same are defined in the petition, with the exception that the commissioners may, upon request of the owners, add lands that in their judgment may be benefited; but they have no authority to exclude any, although there may be some included which cannot be benefited by the proposed drainage system. From this the result is inevitable that the petitioners themselves pass upon the question whether certain lands are benefited or not by including them within the district. A careful reading of the entire drainage act discloses no way by which the judgment of the petitioners in this regard may be questioned by any one. This, respondents' counsel contends, leaves his clients without any hearing before a body or tribunal of any kind with power to pass upon the question of whether their property is in fact benefited or not; and hence, in levying an assessment, it in

effect amounts to, or may result in, taking property without due process of law.

It is not always easy to determine whether a law under which assessments may be levied. on private property for its improvement, or which authorizes the property to be taken or affected for certain purposes, violates the provisions of the federal Constitution, and in this case the Constitution of this state, which provides that no one "shall be deprived of life, liberty, or property without due process of law," nor, in view that the term is both flexible and elastic, is it easy to define it. Mr. Justice Field, in *Hagar v. Reclamation District,* 111 U. S. at page 708, 4 Sup. Ct. at page 667, 28 L. Ed. 569, in referring to this subject, says:

"It is sufficient to observe here, that by 'due process' is meant one which, following the forms of law, is appropriate to the case, and just to the parties to be affected. It must be pursued in the ordinary mode prescribed by the law; it must be adapted to the end to be attained; and wherever it is necessary for the protection of the parties, it must give them an opportunity to be heard respecting the justice of the judgment sought. The clause in question means, therefore, that there can be no proceedings against life, liberty, or property which may result in the deprivation of either, without the observance of those general rules established in our system of jurisprudence for the security of private rights."

In giving legal effect to the foregoing principle in cases like the one at bar, it is not necessary that a hearing be had at any particular stage of the proceeding by which rights may be affected, or that the hearing be had before a regularly constituted court of justice; but it is necessary that a hearing be given at some time, and that the same be had before some officer, tribunal, board, or court to whom the person whose property is affected may present his evidence, objections, and arguments, to the end that the officer, tribunal, board, or court may be enabled to fairly and intelligently pass upon and determine the questions presented for decision. These principles are fully illustrated and applied in the following cases: *Hagar v. Reclamation Dist.,* 111 U. S. 701, 4 Sup. Ct. 663, 28 L. Ed. 569; *Fallbrook Irr. Dist. v. Bradley,* 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369; *Paulsen*

*v. Portland,* 149 U. S. 30-41, 13 Sup. Ct. 750, 37 L. Ed.
637; *Campbell v. Dwiggins,* 83 Ind. 580-482; *Reclamation
Dist. v. Phillips,* 108 Cal. 306, 39 Pac. 630, 41 Pac. 335;
*Stuart v. Palmer,* 74 N. Y. 183, 30 Am. Rep. 289.

The question therefore arises, did the respondents have an
opportunity to be heard before a competent tribunal of any
kind, or at any time before the tax lien was established
against their property at which they were authorized to
have the question determined whether their property should
be held liable for any amount of the proposed assessment
which was levied for the purpose of constructing the drainage
system? As will be seen, section 761 provides that before
the petition for the formation of a district is presented notice
of its presentation shall be given by publication; and sec-
tion 762 provides that a hearing be had upon such petition.
The difficulty, however, is that the commissioners are given
no power—in fact, the power is expressly withheld from
them—to determine what lands may be benefited by the
proposed improvement, and hence what lands should be in-
cluded within the boundaries of the district, except as to
such lands as are susceptible of drainage by the proposed
system, which are asked to be included by the owners thereof.
The inquiry upon the hearing provided for, therefore, is
limited to the latter question.

When the law as it was originally adopted (Sess. Laws
1896, p. 573) and thereafter revised by the code commis-
sioners (R. S. 1898, sections 760 to 779, inclusive) is ex-
amined, it at once becomes clear why a hearing was provided
for in the original act. Until the law in question was
amended in 1905 (Laws 1905, p. 233), any person whose
lands were included within a proposed drainage system or
district had ample opportunity to be heard upon the question
of whether his land was or was not benefited by the pro-
posed drainage, and hence whether the same should be taxed
to pay for the same. The board of commissioners, under
the law as originally passed, had ample power to determine
and fix the boundaries of the proposed district, and to ex-
clude therefrom all lands that in their judgment could not

be benefited by the proposed drainage system. This thus gave the owners of lands an opportunity to be heard before their lands were adjudged to belong to that class which should be burdened with the expense of constructing the proposed improvement. It may be urged, however, that under the law the proposed district is not organized, and cannot be, until an election is held at which at least two-thirds of all the votes cast must be in favor of organizing the district. It will be observed, however, that by section 763 no one is permitted to vote at such election, "unless he shall be a qualified elector in the district." This means that any owner of land who does not actually live within the proposed district, or if he does, but does not possess all of the qualifications of an elector required by the general laws of this state, he cannot vote at the election; and hence, again, the very persons who are the authors of the petition may alone determine whether a district shall be organized or not. This section thus affords no remedy. But it is suggested that section 764 provides for an action which may be commenced by any interested person at any time within one year after the district is organized. This is true and if in the contemplated action any objecting landowner could present and have determined the question of whether his lands are benefited, and hence should be included or excluded within or without the drainage district, the law might perhaps not be objectionable upon the ground now under consideration. It will be seen, however, that the only matters which can be heard and determined in the contemplated action referred to are such as may affect "the validity of the organization" of the district. This action, therefore, is not intended for the purpose of determining what the boundaries of the district should be, nor what lands should be included within the district. It is, however, contended that by section 774 a hearing is provided at which the parties in interest may be heard, and hence have determined what proportion of the cost of construction should be borne by any particular land. This hearing given by this section is no doubt good so far as it goes. The question is, does it go far enough to meet the diffi-

culty we are now confronted with? Under this section the power of the trustees is limited. They must conclusively assume that all the lands within the district as formed are subject to assessment, and all that they can do is to compare the various parcels of land and determine what difference, if any, should be made in the amount of the assessment between or among the several parcels that are assessed. This hearing, in view of the limited powers of the trustees, therefore, also falls short of giving the objecting landowners an adequate remedy.

There is a more serious objection still to the hearing provided for by this section. As we have pointed out, section 762 provides that no person can qualify as trustee, unless he is a freeholder within the proposed drainage district. Every trustee, as a landowner, is therefore directly interested in any assessment that will be made. An objecting landowner is therefore given recourse to a tribunal or body that is directly interested in the contemplated improvement, as well as in the assessment made to pay therefor. Although it be conceded, as no doubt it should be, that the trustees under the law in question are public officers, yet this cannot overcome their interest in the assessment which they are called to pass upon. The tribunal provided for by this section is therefore an interested one, and, to say the least, is not one before which a hearing can be considered due process of law.

When we come to examine section 772, it becomes clear why the powers of the trustees are limited by section 774. Before any hearing provided for by section 774 is had, or may become necessary, district bonds of the drainage district may have been issued as provided by section 772, and these bonds "constitute a lien upon all the lands and improvements thereon within the boundaries of the district." A lien is therefore established upon all the lands within the district as the same was formed when the commissioners finally adopted the petition, and the trustees have no power under section 774, or under any other, to modify or affect in any way this lien. It should not be overlooked in this

connection that the tax is collectible and the lien enforceable by merely advertising and selling the lands under the general tax laws of this state. If the tax in question were collectible only by an action in a court of law or equity, it might be the landowner still had sufficient remedy, because he could present the whole question of whether his land was or was not subject to the tax in such court, and thus prevent the sale of his property. That such an action would afford sufficient remedy has been frequently held by the courts. (See *Reclamation District v. Phillips,* 108 Cal. 306, 39 Pac. 630, 41 Pac. 335, and cases there cited.) Under the law in question, however, it is, to say the least, doubtful whether such an action could afford complete relief, for the reason that by the act the lien is established upon all of the property within the district, with the improvements thereon, when the bonds are issued. It follows, therefore, that, although it were contemplated that the assessment under the law when delinquent should be collected by commencing an action in a court of justice, yet the only question open for litigation, in view of sections 772, 773, and 774, would be whether the trustees had fairly apportioned the tax among the several parcels of land included within the district. The question of what land is benefited and should be included within the district, and the lien created by the bonds, if any were issued, would have been irrevocably fixed before any action could be brought.

But it is further contended that the formation of a drainage district, and defining the boundaries thereof, is a legislative or governmental, and not a judicial, function; that the legislature may itself determine and fix the boundaries of drainage districts, and therefore may, under certain circumstances, delegate this power. The courts have frequently held that such is the law. (See *Tyson v. Washington County,* 78 Neb. 211, 110 N. W. 634, 12 L. R. A. [N. S.] 350, and *Fallbrook Irr. District v. Bradley,* 164 U. S. 166, 17 Sup. Ct. 56, 41 L. Ed. 369 *et seq.,* and cases there referred to.) Nor do we question the doctrine that in case the legislature determines and fixes the boundaries of drainage districts, or, when the power is delegated to some board or governmental

agency, and such agency fixes the boundaries, that the courts may not question or review the action of the legislature or such agency. Nor can the landowner question it. Nor is he, for that reason, under ordinary circumstances at least, deprived of his property without due process of law. Merely to form a drainage district, the boundaries of which may include the lands of any particular person, has not deprived him of anything. When, however, a drain is proposed or constructed and an assessment made and a tax levied upon such lands, upon the ground that they are improved or benefited by such drain, and such a tax is declared a lien upon the land, to discharge which the land may be sold, then the landowner is being affected in his property rights, and is entitled to be heard before the tax and lien are irrevocably established. The law in question in many respects differs from the laws upon the subject of drainage by common owners of lands, who may create what is known as a drainage district upon their own application.

The nearest approach to a law like ours, in so far as forming districts is concerned, is found in California, and the particular feature of forming or organizing districts is ably discussed by Mr. Justice Peckham, in *Fallbrook Irr. Dist. v. Bradley, supra*. The California act is there also set forth. It is very clearly pointed out by Mr. Justice Peckham in that case that, where a district is authorized to be created for the improvement of lands by drainage or otherwise, as is the case under the law in question, the question of whether any particular land is benefited or not, and hence should be included within or excluded from the district, is a question of fact, which must be determined by some proper board or tribunal. The proposition is well stated by Mr. Justice Peckham in that case in the following words:

"The legislature by this act has not itself named any irrigation district, and, of course, has not decided as to the nature and quality of any specific lands which have been included in any such district. It has given a general statement as to what conditions must exist in order to permit the inclusion of any land within a district. The

39 Utah—33

land which can properly be so included is, we think, sufficiently
limited in its character by the provisions of the act. It must be
susceptible of one mode of irrigation, from a common source and
by the same system of works, and it must be of such a character
that it will be benefited by irrigation by the system to be adopted.
. . . The question whether any particular land would be thus
benefited is necessarily one of fact. The legislature, not having
itself described the district, has not decided that any particular
land would or could possibly be benefited as described; and therefore
it would be necessary to give a hearing *at some time* to those inter-
ested *upon the question of fact whether or not the land of any owner
which was intended to be included would be benefited by the irri-
gation proposed.* If such a hearing were provided for by the act,
the decision of the tribunal thereby created would be sufficient."
(Italics ours.)

What was said by Mr. Justice Peckham of the law there in
question is manifestly applicable to the law now under con-
sideration. It is clearly pointed out in that case that in view
that the legislature of California had left it to the board of
county commissioners to determine, upon a hearing by them,
what particular lands would or could be benefited by the pro-
posed improvement, and by that means to determine and fix
the boundaries of the proposed district, that both the hearing
and the tribunal were sufficient to meet the objection of the
landowner that in including his land within the district, and
in assessing it in proportion to the benefits, the same was
taken without due process of law. If the legislature of this
state in amending the law in question had preserved the right
to be heard, to the landowners whose lands are included with-
in the drainage district in question, before some competent
tribunal, which hearing could have been had at some time be-
fore the tax lien was irrevocably established, or before the
lands could have been sold for delinquent assessments upon
the question of whether their lands were benefited by the
proposed drainage district or system, or not, and if so
benefited whether the assessments in question were just and
equitable, when compared with the assessments of other lands
within the district similarly situated, then the question of due
process of law could not arise. As the law now stands, how-
ever, we are firmly of the opinion that this case comes clearly

within the doctrine announced in the cases of *Hutson v. Protection Dist.,* 79 Cal. 90, 16 Pac. 549, 21 Pac. 435; *Stuart v. Palmer,* 74 N. Y. 183, 30 Am. Rep. 289; and *Avant v. Flynn,* 2 S. D. 161, 49 N. W. 15. The case of *Reclamation Dist. v. Phillips, supra,* also supports the doctrine announced in the foregoing cases, although for special reasons a different result was reached in the latter case. Such is also the clear logic of the case of *Fallbrook Irr. Dist. v. Bradley, supra.*

In arriving at the conclusion reached, we have not been unmindful of the salutary rule that laws adopted by the legislature should not, except for the most cogent reasons, be declared invalid, and that, unless it is quite clear that a law is contrary to some constitutional provision, it should be upheld. The law in question has been so amended, however, that it no longer meets the objections now urged against it, and for that reason cannot be enforced in its present form. As we have already pointed out, however, the statute in question is not objectionable for the reason that drainage is permitted without showing that the same is necessary to improve or benefit the public health. Drainage statutes like the one before us, like irrigation statutes, are based upon the theory that lands, otherwise useless, may be reclaimed and devoted to a useful purpose. In thus reclaiming waste lands, the owners are directly, and the public or the state is indirectly, benefited. *Hoagland v. Wurtz,* 41 N. J. Law, 175. By such laws it is not intended, nor do we hold, that they may be used for the purpose of merely making lands already used for one agricultural purpose available for another and different agricultural purpose; but, as already stated the statute may be invoked only for the purpose of reclaiming waste, overflowed, or swamp lands. Public health is no more an element in such a statute than it is in a statute authorizing the formation of irrigation districts by a certain number of arid landowners to reclaim such lands. The purpose of both statutes is the same, namely, to reclaim waste lands, and in that way benefit both the owners and the public. Such laws are salutary and should be reasonably construed, and, unless violative of some fundamental or constitutional right, should be upheld. In

adopting such laws, however, the rights of all interested persons must be recognized and protected and an opportunity to be heard must be given. In this respect, the statute in its present form is defective and hence must fall.

The law may be easily amended so as to meet this defect. This may be done in several ways. The right may be given to the landowners to have a hearing before the board of county commissioners before the boundaries of a drainage district are established; or the right to have a hearing upon the latter question may be given in an action where the organization of a district may be litigated; or the right to a hearing upon this question may be permitted at the time hearings upon assessments are given. As we have pointed out, however, these hearings should not be before the trustees of the district. While the trustees may no doubt make the assessment, they should, after making it, be required to report the same forthwith to the county commissioners who should at once fix a time and place for a hearing, and give the interested parties notice and an opportunity to be heard, upon the question of whether the amount is fair and just. In this way every landowner will be given the right to be heard before some competent and disinterested tribunal, and in such event cannot complain that his property is being taken without due process of law.

In view of the foregoing, there is no escape from the conclusion that the judgment of the district court should be affirmed, with costs to respondents. It is so ordered.

McCARTY, J., concurs.


STRAUP, J.

I concur in holding the act unconstitutional for the reason stated that no opportunity is given objecting landowners to be heard. I am of the opinion that the act is also invalid, because the purpose for which drainage districts may be organized, with powers conferred on them to forcibly take private property by taxation, is not restricted or confined to a public use or benefit, or a purpose in which the public are

directly concerned. The act contemplates and permits the organization of drainage districts, with powers conferred on them to take private property by taxation, for a mere private benefit or advantage. That, I think, is evident from reading the first section of the act (section 760 of the Compiled Laws referred to by the Chief Justice), where the purpose for which drainage districts may be organized is defined, and the persons who may propose their organization are specified. The more it is read, the clearer appears the absence of any public use or benefit for which drainage districts may be organized, and the presence of a mere private benefit or advantage. In all the cases cited by the Chief Justice, where acts relating to the construction and maintenance of mills and dams upon and across streams, not navigable (*Head v. Amoskeag Mfg. Co.,* 113 U. S. 9, 5 Sup. Ct. 441, 28 L. Ed. 889), to the drainage of large tracts of swamp or marshy lands (*Wurts v. Hoagland,* 114 U. S. 606, 5 Sup. Ct. 1086, 29 L. Ed. 229; *Tidewater Co. v. Coster,* 18 N. J. Eq. 518, 90 Am. Dec. 634; *State v. Blake,* 36 N. J. Law, 442), and to the irrigation of large tracts of arid lands (*Fallbrook Irr. Dist. v. Bradley,* 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369), there was present an element of public utility or good, not necessarily, as the courts say, beneficial to public health, but nevertheless relating directly to some public use or benefit. And it was upon that ground alone that the validity of the several acts was upheld. That some public good or benefit is present in the reclamation of large tracts of swamp or marshy lands, such as existed in New Jersey, Indiana, and other states, may be conceded. But the statute here is not founded on such or similar conditions. Under it a small number of persons, desiring to drain their lands, and holding title to a major part of lands, great or small in extent, and proposed by them to be included in a drainage district, may compel, by forcible taxation, a less number, holding title to less than the major part of the proposed tract, to drain their lands against their will, independently of any question of public good, use, or benefit, and wholly for the mere private benefit and ad-

vantage of the landowners. I do not think that such a power for such a purpose may either be exercised or conferred by the legislature without offending against the constitutional provisions referred to by the Chief Justice.

Nor is there anything made to appear from the alleged facts, either in the complaint or in the answer, that the drainage district in question was organized to reclaim waste lands for any public good or benefit, or that the powers exercised by the organization were for such purpose. To the contrary, from such alleged facts, it appears that the district was organized, and that those holding title to a major part of the land included in the proposed district attempted to compel those holding title to less than the major part, by forcible taxation, to drain their lands for a mere private benefit or advantage of the landowners, independently of any question of a public-use or benefit.

For these reasons, I concur in the judgment.